[No. 5051.]
[No. 2616 C. A.]

## CLAMP V. CUTLER.

1.  **Principal and Agent—Partnership—Sharing Profits for Serv-ices.**

Where one person furnishes money to another to buy and sell certain material, and the latter is to receive a share of the profits as compensation, the relationship is that of principal and agent, and not that of partnership; and either party has the right to terminate the agency at any time, and, upon its termination, the person furnishing the money is entitled to all stock purchased with his money and remaining unsold.—P. 121.

2.  **Appellate Practice—Conflicting Evidence—Question for Jury —Verdict Not Disturbed on Appeal.**

Where a question has been submitted with proper instructions, and the jury have found the issue in favor of one of the parties upon conflicting evidence, the verdict will not be disturbed on appeal.—P. 121.

*Error to the County Court of Las Animas County. Hon. John A. Lindsay, Judge.*

Action by E. R. Cutler against Samuel Clamp. From a judgment for plaintiff, defendant brings error.                              *Affirmed.*

Mr. W. M. MAHIN, for plaintiff in error.

Mr. W. B. MORGAN, for defendant in error.

Mr. JUSTICE GODDARD delivered the opinion of the court:

This case involves the right to the possession of certain scrap iron, and this right depends upon the

business relation that existed between the plaintiff
and defendant at the time the action of replevin was
commenced. The defendant in error, plaintiff be-
low, claims that the plaintiff in error, defendant be-
low, was acting as his agent in the purchase and
handling of the property in question. The plaintiff
in error claims that he purchased the same with his
own money, with the consent of defendant in error.
The plaintiff testified substantially as follows:

"My name is E. R. Cutler; I am the plaintiff in
this case; the property taken in this suit was scrap
iron, and it was back of Mr. Clamp's place of busi-
ness; * * * there was probably a car load of it,
and it was in Mr. Clamp's possession, he was buying
it for me; I employed him to buy it for me; I had an
arrangement with him to buy junk stock including
other matters; he was buying the junk stock for me,
I was furnishing the money and he was doing the
buying and handling of it; I made a demand of him
for the possession of this property in August, 1899."

He further testified that at the time he made
this demand Clamp was loading the iron upon a car
against his, Cutler's, objection, and testified further:

"There was no agreement between Clamp and
myself as to the time he was to act for me; prior to
the conversation I had with Clamp when making a
demand for the property, * * * he had no au-
thority from me to sell that iron without my consent;
I don't know of him buying any of this iron with
his own money; I furnished him money to buy; he
was to do business for me and not for himself; he
was to buy this iron for me and junk stock. Junk
stock is iron material of different kinds; I furnished
the money to buy this stock; that was the understand-
ing and agreement and the fact; I kept money there
all the time, when he got out he would let me know;

he would ask me for more money and I gave it to him.''

On cross-examination he stated:

''I was to furnish the money to buy the junk stock which includes the iron, and I was to furnish all the money; he was to attend to the buying and handling of it; he was to furnish his services and was to have 60 per cent. of the profits after the stock was disposed of; he was to have 60 per cent. of the profits after my money had been repaid and all of the costs and expenses of the handling. He bought the junk himself with my money.''

The defendant Clamp testified as follows:

''I am the defendant in this case;  *  *  *  In the month of December, 1897, plaintiff Cutler agreed to advance money to buy junk, and during a period of twenty months prior to the commencement of this suit he had advanced at different times in small amounts, all told, $558.20; I bought the junk in my own place of business which was run in my own name; Cutler's name was never known in the junk business.''

After specifying in detail the sales made between March 10, 1898, and the 10th day of August, 1899, he continues:

''I paid Cutler out of the sales I have just mentioned a total of $810.17, and these were all the sales made of any material bought with any part of Cutler's money; the total sales of all kinds of junk up to the commencement of this suit was $1,213.67; Cutler was to receive from the proceeds of the sales of the junk purchased with his money, the amount of money he had advanced and 40 per cent. of the net profits on his investment. I was to receive 60 per cent. of the net profits of his investment and was to be reimbursed for all expenses paid by me in handling the junk out of the gross receipts from the sales

of the junk purchased with his money; * * * at the time I purchased the property sought to be replevined in this suit, which was exclusively scrap iron, I did not have a cent of Cutler's money to be used for buying scrap iron. About March 10, 1899, * * * I met Cutler at my place of business on Commercial street, and after showing him that all the scrap iron was cleared up, I said to him that all the scrap iron we had bought was cleared up and sold and that I wanted the room for other purposes, and I told him that there was not enough of profit in the junk business for both of us and that he or I must step out, and I told him he could have his choice to either run it himself alone or I would run it myself.

"At that time the scrap iron was all cleared up, but we still had some old copper, brass, zinc, rubber, lead, bones and rags on hand, but not enough for a car load, and I told him we would buy enough of copper, brass, bones, etc., to fill out the car load, but that I would buy the scrap iron for myself and with my own money, and he agreed to it. * * * All scrap iron bought by me after March 1, 1899, was paid for out of my personal money exclusively, and the property or scrap iron sought to be replevined in this suit was paid for out of my personal funds."

In rebuttal Cutler testified as follows:

"Clamp had money of mine at all times; I kept money with him whenever he needed it to buy junk.

"The scrap iron was never all cleaned up to my knowledge and he never told me it was; he did say something about the business not being profitable enough for both, but nothing else was said or done; he never said anything whatever about buying anything with his own money or about buying scrap iron for himself; and I never gave him my consent to do so.

"Clamp had my money to buy scrap iron and

other junk with at all times, and the property replevined was bought with my money, or at least when he had my money to buy with; I never at any time overdrew my share of the money, as he calls it."

It is obvious from the foregoing testimony that the relation between these parties, so long as it continued, was that of principal and agent. "Sharing profits as compensation for services does not make a partnership."—*Darrow v. St. George,* 8 Colo. 592.

Either party had the right to terminate this agency at any time, and upon its termination Cutler was entitled to the possession of whatever property Clamp had in his possession that was purchased during its existence. The only question of fact, therefore, to be determined by the jury was whether this relation was terminated on March 10, 1899, or the scrap iron purchased with Clamp's money with the consent of Cutler, as testified to by Clamp, or whether it was in force at the time of such purchase, as testified to by Cutler.

We think this question was properly submitted to the jury by the instructions complained of, and the jury having found the issue in favor of defendant in error upon conflicting testimony, we are not at liberty to disturb the verdict.

The judgment is therefore affirmed.

*Affirmed.*

CHIEF JUSTICE STEELE and Mr. JUSTICE BAILEY concur.